[No. 28893. *En Banc.* October 9, 1942.]

THE STATE OF WASHINGTON *on the Relation of Edwin C. Ewing, Plaintiff,* v. BELLE REEVES, *as Secretary of State, Respondent.*[1]

[1]Reported in 129 P. (2d) 805.

Ray Dumett, John Ambler, S. Harold Shefelman, and Gail M. Williams, for relator.

The Attorney General, Harold P. Troy, and John Spiller, Assistants, for respondent.

Neal, Bonneville & Hughes, Metzger, Blair & Gardner, and Loren Grinstead, amici curiae.

STEINERT, J.—On October 1, 1942, relator, Edwin C. Ewing, made application to this court for a writ of mandamus to compel respondent, Mrs. Belle Reeves, secretary of state of the state of Washington, to place his name on the judicial ballot at the next general election to be held November 3, 1942. In response to an alternative writ and order to show cause, the respondent, appearing by the attorney general, filed her return on October 3rd. Briefs were thereafter submitted by counsel for the respective parties and by amici curiae consisting of Messrs. Neal, Bonneville & Hughes, and Messrs. Metzger, Blair & Gardner, of Tacoma. On October 6th, the cause was argued before the court sitting En Banc. At the hearing, Mr. Loren Grinstead,

of Seattle, appeared as *amicus curiae* and participated with the others in the oral argument.

The facts upon which this proceeding is based are these: At the primary election held September 8, 1942, there appeared on the ballot, as candidates for nomination for judge of the supreme court, position number one, the names of John F. Main, the present incumbent; Joseph A. Mallery, then and now a judge of the superior court for Pierce county; Edwin C. Ewing, the relator herein, who is a practicing attorney of Seattle; and Eret L. Casey, a practicing attorney of Walla Walla. The unofficial election returns showed that no one of the candidates had received a majority of all the votes cast for that position, but that John F. Main had received the greatest number of votes cast, Joseph A. Mallery the next greatest, and Edwin C. Ewing the next greatest after Mallery.

A few days prior to the primary election, Judge Main was suddenly stricken with a serious illness, and, on September 14, 1942, which was after the primary election but prior to the official canvass and certification, he declined the nomination, as shown by the following communication sent to the respondent:

"To Honorable Belle Reeves, Secretary of State of the State of Washington.

NOTICE

"Pursuant to Section 5175, Remington's Revised Statutes, I hereby notify you that I decline the nomination for Judge of the Supreme Court (Position No. 1) of the State of Washington.

"Dated this 14th day of September, 1942.
Witnesses:
Margaret M. Wylde
Hanna McLean

(Signed) John F. Main"

Thereafter, on September 24, 1942, which was prior to the time for the official canvass and certification,

relator prepared and sent to respondent a formal application in writing requesting that, if the official canvass should confirm the unofficial returns, she certify relator's name as that of one of the two candidates for judicial position number one. On September 28, 1942, the state canvassing board met and canvassed the primary election vote, as required by law. The canvass with respect to the above-mentioned judicial position disclosed that the several candidates had received the number of votes set opposite their respective names as follows:

| | |
|---|---|
| John F. Main, | 67,437, |
| Joseph A. Mallery, | 66,752, |
| Edwin C. Ewing, | 39,036, |
| Eret L. Casey, | 26,275, |

thus confirming the unofficial returns. Respondent thereupon refused to certify relator's name as previously requested by him, and in consequence thereof relator thereupon instituted this action to obtain the relief referred to above.

It is relator's contention that, since no candidate received a majority of all votes cast at the primary election for position number one of the supreme court, the names of *two* candidates must appear on the ballot at the general election to be held on November 3rd, in accordance with Rem. Rev. Stat., § 5212 [P. C. § 2259], and that, since Judge Main declined the nomination, thereby rendering his nomination void, as provided in Rem. Rev. Stat., § 5175 [P. C. § 2166], the two candidates entitled to have their names placed on the ballot for position number one are Joseph A. Mallery and relator, Edwin C. Ewing.

The election laws of this state with reference to nominations and primary elections are found in volume 6 of Rem. Rev. Stat., Title 29, chapter 4, appearing therein as §§ 5167 to 5213-2 [P. C. §§ 2158 to 2260], in-

clusive, and consisting, for the most part, of portions of the general election act of 1890 (Laws of 1890, chapter 13, p. 400) and the primary election act of 1907 (Laws of 1907, chapter 209, p. 457), together with the subsequent amendments thereto, respectively. The pertinent sections, considered in their logical sequence rather than in their numerical order, are Rem. Rev. Stat., §§ 5212, 5175, 5176.

Rem. Rev. Stat., § 5212 [P. C. § 2259], prescribes the method for determining the candidates whose names are to be placed on the general election ticket, under the heading "judicial ticket." So far as pertinent here, that section reads as follows:

"When there are to be elected at any general election one or more judges of the supreme court, . . . the candidates for each respective office whose names are to be placed on the general election ticket shall be determined as follows: Not less than ten days before the time for filing declaration of candidacy, the secretary of state, . . . shall designate by number each position to be filled upon the supreme court, . . . Each candidate at the time of the filing of his declaration of candidacy shall designate by the number so assigned, the position for which he is a candidate and the name of such candidate shall appear on the ballot only for such position. *The name of the person who receives the greatest number of votes and of the person who receives the next greatest number of votes for each position, shall appear on the general election ballot under the designation for each respective office: Provided, however, that where any candidate for such position, so designated as aforesaid, shall receive a majority of all votes cast at such primary election for such position, the name of such candidate receiving such majority shall be printed separately on the general election ballot under the designation 'Vote for One' and the name of no opposing candidate shall be printed on such ballot in opposition to such candidate,* but one space shall be left following such name in which the voter may insert the name of any person for whom he

wishes to cast his ballot. . . ." (Italics ours.) (Laws of 1925, Ex. Ses., chapter 68, § 1, p. 66, as amended by Laws of 1927, chapter 155, § 1, p. 140.)

Rem. Rev. Stat., § 5175 [P. C. § 2166], provides for declinations of nominations for public office, as follows:

"Whenever any person nominated for public office, *as in this chapter provided,* shall at least twenty days before election, . . . in a writing signed by him, notify the officer with whom the certificate nominating him is by this chapter required to be filed, that he declines such nomination, *such nomination shall be void.* . . ." (Italics ours.) (Laws of 1890, chapter 13, § 11, p. 404, as amended by Laws of 1921, chapter 178, § 3, p. 701.)

Rem. Rev. Stat., § 5176 [P. C. § 2167], provides the method for filling vacancies occasioned by declinations, insufficiency, or inefficacy of nominations, as follows:

"Should any person so nominated die before the printing of the tickets, or decline the nomination *as in this chapter provided,* or should any certificate of nomination be or become insufficient or inoperative from any cause, the vacancy or vacancies thus occasioned may be filled *in the manner required for original nominations.* If the original nomination was made by a party convention which had delegated to a committee the power to fill vacancies, or by primary election, the committee of the political party he represents may, upon the occurring of such vacancy, proceed to fill the same. [Here follows a detailed description of the manner in which the proper committee of the political party shall fill vacancies occasioned as previously stated.]" (Italics ours.) (Laws of 1890, chapter 13, § 12, p. 404.)

Relator bases his contention upon three propositions. His first argument is that since Rem. Rev. Stat., § 5212, expressly provides that only in the event that a candidate shall have received a majority of all votes cast at the primary election shall the name of such candidate alone be printed on the general election ballot as being

unopposed, and since no one of the candidates received such majority at the primary election, therefore neither Judge Mallery nor any other one of the candidates is entitled to an exclusive listing on the general election ballot. In furtherance of that argument, relator leans upon the correlative provision in Rem. Rev. Stat., § 5212, reading:

"The name of the person who receives the greatest number of votes and of the person who receives the next greatest number of votes for each position, shall appear on the general election ballot under the designation for each respective office."

Relator then concludes that, by reason of the failure of any one of the candidates to fulfill the first requirement above mentioned, the provision last above quoted becomes effective, compelling a listing of *two* names on the general election ballot, thereby permitting the electorate to express its choice between them. Arriving at that result in his argument, relator contends that, for reasons stated in his subsequent propositions, which we shall discuss later, he is entitled to have his name, together with that of Judge Mallery, placed on the general election ballot. In other words, he claims that his present status with reference to the recent primary election is that of "the person who receives the next greatest number of votes" for the particular judicial position.

Relator's entire argument upon this first proposition fails, for the simple reason that he himself has not met the condition precedent to having his name appear on the general election ballot, as now requested by him. He did not receive the greatest number nor the next greatest number of votes cast at the primary election and therefore did not fulfill the requirements demanded of him in order to gain a specific listing on the general election ticket. The vote of the electorate

at the primary election not only determined definitely the candidates who were entitled to have their names appear on the general election ballot, but also determined, just as definitely, the candidates who were not entitled to that privilege. In short, relator was not a successful candidate at the primary election, but, on the contrary, was, in political parlance, a "defeated candidate." See *State ex rel. Acton v. Penrod,* 102 Neb. 734, 169 N. W. 266.

*So far as the relator and his rights are concerned,* Judge Mallery is entitled to have his name printed separately on the general election ballot, not on the assumption that he received a majority of all the votes cast at the primary election, but, rather, because (1) he was one of the two candidates who, by receiving the greatest number and the next greatest number of votes cast at that election, became entitled to have their names appear on the general election ballot, under the designation for the particular office, and (2) assuming, as relator contends, that Judge Main's nomination has become nugatory, thereby forestalling the appearance of his name on the general election ballot, Judge Mallery is the only person left who, under the statute, is entitled to distinctive placement. Judge Main's declination in any event affected only his own nomination. It did not create for relator the essential element which only the electorate could supply, namely, the number of votes necessary to put relator in the category of a *nominee* by virtue of the primary election.

Relator's second proposition is that Judge Main had the right, granted by Rem. Rev. Stat., § 5175, to decline the nomination; that, when he did so, his nomination became void; and that therefore under no theory may his name appear on the general election ballot. This proposition is an essential factor in relator's chain of reasoning upon his first proposition and is likewise

a premise to his third proposition, hereinafter stated. The attorney general and *amici curiae,* of Tacoma, agree, to a certain extent, with relator on this second proposition. Mr. Grinstead, appearing as *amicus curiae,* takes an opposite view with respect to the matter of having Judge Main's name appear on the general election ballot. As will later be explained, the members of this court are divided in their views upon this particular subject. For the present, however, we confine ourselves to the contention made by relator, on the one hand, and that made by the attorney general and *amici curiae,* of Tacoma, on the other.

If Judge Main's declination be regarded as void in the sense that the votes cast for him at the primary election are not to be counted or considered at all, that view would be fatal to relator's cause, for the reason that Judge Mallery received a clear majority of all other votes cast at that election for position number one. The official returns show that at the primary election a total of 199,500 votes was cast for that position. If we eliminate the 67,437 votes received by Judge Main, we have left a net total of 132,063. Of these, Judge Mallery received 66,752 votes, a majority of 1,441 over the combined votes for relator and for Mr. Casey.

Relator, of course, would not have us take that view of the matter, nor do the attorney general and assisting *amici curiae* rely upon that solution as their theory of the case. On the contrary, both the relator and the respondent assert that, while Judge Main's declination rendered his nomination void, the votes received by him must still be counted for the purpose of determining the candidates who received the greatest number and the next to greatest number of votes cast at the primary election. Relator's contention in that respect is that counting all the votes, including those received

by Judge Main, establishes the fact that Judge Mallery did not receive a majority of all the votes cast and therefore is not entitled to go on the general election ticket unopposed. The attorney general and the Tacoma *amici curiae,* on the other hand, contend that counting Judge Main's votes, together with all the others, establishes the fact that relator is not one of the two candidates receiving the required number of votes, as provided in Rem. Rev. Stat., § 5212, and for that reason relator is not entitled, in any event, to have his name printed upon the general election ballot.

■ The members of this court are unanimously in accord with the view that the votes cast for Judge Main must, in any event, be counted for the purpose of determining the candidates who received the greatest number and the next to greatest number of votes cast at the primary election. For cases covering analogous situations, see annotation, 133 A. L. R. 319 *et seq.* The members of the court are also unanimously of the view that, for the reasons already given above in disposing of relator's first proposition, the counting of Judge Main's votes establishes the fact that relator is not one of the persons who, under the terms of the statute, is entitled to have his name printed on the general election ballot.

■ Relator's third, and final, proposition is that Judge Main's declination created a "vacancy"; that, by the terms of Rem. Rev. Stat., § 5176, such "vacancy" must be filled "in the manner required for original nominations"; and that, by according relator a place on the general election ballot, in consequence of the circumstances heretofore shown to exist, the requirements of the statute with reference to filling vacancies will have been satisfied. If the phrase "in the manner required for original nominations" be considered apart from its context and without reference to the inte-

grated enactments of the legislature with respect to elections, it is manifest that relator could not secure a place on the general election ballot, because the "manner required for original nominations" would necessitate a new filing for the "vacancy," open to all who should declare their candidacy therefor and, further, would necessitate that another primary be held to determine who should fill that vacancy. Both of these steps would be impossible, for neither would the time permit that to be done nor does the statute make any provision for such procedure.

When Rem. Rev. Stat., § 5176, is read in its entirety, it becomes apparent that it makes provision for filling only those vacancies which occur when nominations by political parties, whether by party convention or by primary election, have been declined by the nominee or when they have become insufficient or inoperative, but the statute makes no provision for filling vacancies occasioned by declination of nomination for judicial office. This may be a regrettable fact, but whether so or not, it presents a situation which calls for legislative action, not for judicial remedy.

Courts cannot usurp the functions of the legislature nor read into a statute something which they may conceive to have been unintentionally left out by the legislative body. *Seattle Ass'n of Credit Men v. General Motors Acceptance Corp.,* 188 Wash. 635, 63 P. (2d) 359; *In re Phillips' Estate,* 193 Wash. 194, 74 P. (2d) 1015; *Maryland Cas. Co. v. Tacoma,* 199 Wash. 384, 92 P. (2d) 203.

In the absence of statutory provision, there is no authority for filling vacancies in nominations. See, generally, *Heney v. Jordan,* 179 Cal. 24, 175 Pac. 402; *Brown v. Potteck,* 107 Kan. 737, 193 Pac. 359; *Hermann v. Lampe,* 175 Ky. 109, 194 S. W. 122; *State ex rel. Acton*

*v. Penrod,* 102 Neb. 734, 169 N. W. 266; *State ex rel. Oleson v. Minor,* 105 Neb. 228, 180 N. W. 84; *Rose v. Parker,* 91 N. J. L. 84, 102 Atl. 145; *State ex rel. Jones v. O'Dwyer,* 97 Ohio 22, 119 N. E. 732; 29 C. J. S. 126, Elections, § 93.

It may be that the legislature has thus far made no provision for filling vacancies in nominations for judicial office because of the provision in Rem. Rev. Stat., § 5212, which requires that "one space shall be left following such name [that of an unopposed candidate] in which the voter may insert the name of any person for whom he wishes to cast his ballot." But whether or not that be the reason for the failure of the legislature to provide a method for filling vacancies in judicial nominations, the fact remains that no statutory provision for such contingency has been made, and therefore relator cannot substantiate his claim upon the fact of a present vacancy in nomination.

 As indicated in a preceding portion of this opinion, the members of this court entertain divergent views as to the effect of Judge Main's declination, so far as the general election ballot and its ultimate make-up are concerned. As stated before, all of the judges concur in holding that, in any event, the votes received by Judge Main must be counted for the purpose of determining which candidates received the greatest number and the next to greatest number of votes cast at the primary election. Beyond that point, however, a difference of opinion has arisen: Judges Beals, Millard, Blake, and Driver are of the opinion that Judge Main's declination, under Rem. Rev. Stat., § 5175, prevents the listing of his name upon the general election ballot. On the other hand, Chief Justice Robinson and Judges Simpson, Jeffers, and Steinert are of the opinion (1) that Rem. Rev. Stat., § 5175,

providing for declinations of nominations for public office, does not apply to judicial elections held pursuant to Rem. Rev. Stat., § 5212, and (2) that, despite such declination, the following language contained in Rem. Rev. Stat., § 5212, is mandatory and controlling:

"The name of the person who receives the greatest number of votes [in this instance, Judge Main] and of the person who receives the next greatest number of votes [in this instance, Judge Mallery] for each position, *shall* appear on the general election ballot under the designation for each respective office." (Italics ours.)

We mention this divergence of view simply because the attorney general has recently rendered an opinion to the respondent advising her that Judge Mallery alone is entitled to be certified as a nominee for position number one of the supreme court and has again expressed that view in his brief in this cause. Since the court is equally divided upon that particular question, we can give no authoritative decision thereon, nor can we by any form of writ direct respondent's action with reference to the appearance of Judge Main's name on the general election ballot. We therefore limit ourselves to the disposition of relator's application, upon which question the court is unanimous in its decision.

The application for writ of mandamus is denied.

SIMPSON and JEFFERS, JJ., concur.

ROBINSON, C. J. (concurring in the result)—The foregoing opinion arrives at its result by holding that the relator's name cannot be placed upon the general election ballot because he neither received the greatest number of votes nor the next greatest number. There are additional, and to my mind compelling, reasons for the result reached. These are that Judge Main's

declination did not render his nomination void; that the names, John F. Main and Joseph A. Mallery, are, by the clear mandate of the legislature, required to appear upon the ballot; and that, since but two names can lawfully appear thereon, the writ prayed for by the relator must be denied.

To hold that Judge Main could lawfully decline the nomination is to hold that he lawfully could, and did, disfranchise a large section of the electorate. To so hold is to hold that our statutes permitted him, in effect, to elect his own successor by a mere stroke of the pen. To so hold is to declare that his declination allows Judge Mallery to go on the final election ballot unopposed, although Judge Mallery received but 66,752 of the 199,500 votes cast, and the statute (Rem. Rev. Stat., § 5212) plainly requires that a candidate, in order to go on the final election ballot unopposed, must have a majority of all the votes cast.

The opinion further holds—and rightly—that, in determining whether any of the candidates received a majority, the vote cast for Judge Main must be taken into account. Suppose, as might have happened, that Judge Main had received a majority of the vote, then he clearly would have been the only person entitled to go on the election ballot; but, if he could decline the nomination, then there would be no one to go on the ballot, and no final election could be had. I am unable to believe that the legislative branch of the government intended the election machinery it has set up, particularly the judicial election machinery, to work that way. The consequences are too foreign to all normal conceptions of public policy, and, as Judge Cardozo said in *In re Rouss*, 221 N. Y. 81, 91, 116 N. E. 782, 785:

"Consequences cannot alter statutes, but may help to fix their meaning. Statutes must be so construed, if possible, that absurdity and mischief may be avoided."

Rem. Rev. Stat., § 5175, by virtue of which Judge Main purported to act in declining the nomination, provides that a person nominated for public office may decline the nomination provided he does so at least twenty days before the election. This statutory provision had its origin in the Australian ballot law which, some fifty years or so ago, was widely adopted in the United States. Our own state adopted it in 1890, with modifications, in chapter 13, entitled "Election Laws," Laws 1889-90, p. 400. What is now our § 5175, Remington's Revised Statutes, is § 11 of that chapter, as re-enacted in 1921. It will immediately be seen, upon reading the earlier sections of the chapter, that § 11 was intended to apply only to partisan candidates, whether nominated by convention or by primary. Section 12 of the chapter makes elaborate provisions for the prompt substitution of new candidates in case nominations are declined.

It has been held, in states having similar provisions, that one may not decline a nomination after the time fixed in the act. In so holding in *Commonwealth ex rel. Hudson v. Martin,* 7 Pa. Dist. 666, 667, the court said:

*"Not only the candidate, but the party or body of citizens that nominated him, has an interest in the names upon the ballot.* If a candidate desires to withdraw, he must declare his intention within the time fixed by the Act, in order that his party or the body of citizens that named him may have an opportunity to supply his place. This secures fair play; for if withdrawals could be made at any time, either before the ballots were printed, or before the day of election, it is manifest that a serious temptation to fraud and trickery would be presented. A withdrawing candidate could disfranchise his party by judiciously timing the date of his disappearance, and we need not suggest the dangers that lie hid in such a possibility." (Italics mine.)

We shall, of course, be subject to all these dangers if a judicial nomination may be declined; for, as pointed out in Judge Steinert's opinion, the legislature has provided no method of substituting candidates for those who decline judicial nominations. The very fact that the legislature has not done so raises some inference that it did not intend the declination statute to apply in judicial elections.

(For other decisions on statutes similar to our § 5175, see *Napton v. Meek*, 8 Idaho 625, 70 Pac. 945; *State ex rel. Eastman v. Dewey*, 73 Neb. 396, 102 N. W. 1015.)

A great deal of argument was made at the hearing of this cause to the effect that it is inferable, from prior decisions and from certain cited legislative acts, that the legislature did understand, and intend, that the declination statute should apply to judicial elections. Some of these arguments were quite plausible, but, after an exhaustive study, I have come to the conclusion that they are no more than that. I shall not enter into a discussion of this matter because, in the exact situation which confronts us, it is not controlling.

Let it be remembered that the exact question to be determined is whether § 5175 authorizes one who was nominated in the judicial election held September 8, 1942, to decline that nomination. Our declination statute, as it now appears in the current code as § 5175, is a reenactment of § 11 of chapter 13, Laws of 1889-90, in the form of an amendment of that section, making only typographical changes This reenactment was made in chapter 178, Laws of 1921, p. 701, and it reads as follows:

*"Whenever any person nominated for public office, as in this chapter provided,* shall at least twenty days before election, except in the case of municipal elections, in a writing signed by him, notify the officer with whom the certificate nominating him is by this chapter

required to be filed, that he declines such nomination, such nomination shall be void. In municipal elections such declination must be made at least ten days before the election." (Italics mine.)

Note the words which I have italicized in the above quotation. Judge Main was indeed nominated for public office, but not *"as in this chapter provided"* (that is, chapter 178, Laws of 1921), *but as provided in an act passed six years later,* namely, chapter 155, Laws of 1927, p. 140, which is:

"AN ACT relating to the nomination and election of Supreme Court and Superior Court Judges, . . ."

Clearly, by its very terms, § 5175 extends only to persons nominated as provided in chapter 178, Laws of 1921, and not to the act under which Judge Main was nominated, and he was mistaken in supposing that he had the right to decline the nomination by virtue of its provisions. The mistake was natural enough since he was seriously ill at the time, and, no doubt, did not have the statutes at hand.

In enacting chapter 155, Laws of 1927, the chapter under which Judge Main was nominated, the legislature included nothing permitting or authorizing, or even intimating, that judicial candidates, nominated as therein provided, might decline nominations made under the act, but, on the contrary, provided, in the most plain, explicit, and mandatory terms, that:

"The name of the person who receives the greatest number of votes and of the person who receives the next greatest number of votes for each position, *shall* appear on the general election ballot under the designation for each respective office." (Italics mine.)

We, therefore, cannot issue a mandate to the secretary of state commanding her to put the name of Edwin C. Ewing on the ballot, for the legislative mandate, just quoted, is definite, clear, and unambiguous,

and leaves nothing in doubt. It says to the secretary of state that the name of the person receiving the greatest number of votes (that is, John F. Main) and the name of the person receiving the next greatest number (that is, Joseph A. Mallery) *shall* appear on the general election ballot.

For the foregoing reasons, I concur in holding that the writ prayed for should not issue.

BEALS, J. (concurring)—I concur in the opinion of Judge Steinert. As to the validity of Judge Main's declination, it is my opinion that Rem. Rev. Stat., § 5175, applies to primary elections to judicial office. Passing this question, however, I am convinced that a candidate for public office, who has been regularly nominated (in the absence of a statute providing that such a nominee may not withdraw) may decline a nomination within a reasonable time after receiving the same, regardless of whether or not there be any statute providing for such declination. This right is not taken away by the general terms of Rem. Rev. Stat., § 5212, that section not referring to the matter of a nominee's declination. The courts generally have recognized the right of a candidate to decline a nomination, and certainly that policy has received statutory recognition in this jurisdiction.

BLAKE and DRIVER, JJ., concur with BEALS, J.

MILLARD, J. (concurring in part)—I do not concur in the view that Rem. Rev. Stat., §§ 5175 and 5176, are applicable to nonpartisan primary elections. That, in the absence of statute, a candidate may decline a nomination, needs no citation of sustaining authority. Rem. Rev. Stat., § 5175, which is declaratory of the right of declination, has to do solely with declination of nomination for a partisan office. Judge Main's declination

of the nomination was a waiver of his right to a place on the ballot in the general election. Judge Main's waiver of his right could not, in the absence of a statute to that effect, vest in the defeated candidate or candidates a right to a place on the ballot in the general election. To hold otherwise would constitute judicial legislation.

Under Rem. Rev. Stat., § 5212, only two persons, Judge Main and Judge Mallery, are entitled, by virtue of the vote they received in the primary election, to a ballot position in the general election. Judge Main's waiver of that right does not entitle any other person to a place with Judge Mallery on the ballot, hence Judge Mallery alone is entitled to be certified as a nominee for supreme court position number one.

I agree with counsel appearing as friends of the court that, while it may be unfortunate if vacancies occur on the judicial ballot which can not be filled before the general election, the court is without power to provide the procedure for filling such vacancies where the legislature has not seen fit to do so.